E-FILED
Tuesday, 26 October, 2021  12:26:43 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, as subrogee of Midstate Manufacturing Company, <br><br> Plaintiff, <br><br> v. <br><br> PROGRESS RAIL SERVICES CORPORATION, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br><br> Case No. 4:19-cv-04200-SLD-JEH |

ORDER

Before the Court are Defendant Progress Rail Services Corporation's ("Progress Rail")

Motion for Summary Judgment, ECF No. 19; motion to strike and exclude Plaintiff Cincinnati

Insurance Company's ("Cincinnati") damages expert, ECF No. 20; motion to strike an affidavit

submitted by Cincinnati in support of its response to the summary judgment motion, ECF No.

24; motion to file additional pages in its summary judgment reply, ECF No. 25; and motion for

leave to file a reply in support of its motion to strike the affidavit, ECF No. 28.  For the reasons

below, the Motion for Summary Judgment is GRANTED IN PART, the motion to file additional

pages is GRANTED, and the remaining motions are MOOT.

BACKGROUND[1]

Progress Rail is an Alabama corporation headquartered in Alabama with a facility in

Galesburg, Illinois.  Sometime in May 2018, an employee at Progress Rail's Galesburg facility

---

[1] At summary judgment, a court "constru[es] the record in the light most favorable to the nonmovant and avoid[s] the temptation to decide which party's version of the facts is more likely true."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, the facts related here are taken from Progress Rail's statement of undisputed material facts, Mot. Summ. J. 3–14; Cincinnati's response to Progress Rail's statement of undisputed material facts and Cincinnati's additional material facts, Resp. Mot. Summ. J. 4–20, ECF No. 23; Progress Rail's reply thereto, Reply 1–16, ECF No. 26; and exhibits to the filings.

was operating a crane that either struck or came into proximity with an overhead Ameren power transmission line.

Several miles away, the power went off at a facility owned by Midstate Manufacturing Company ("Midstate"). At the time, one of the machines at Midstate's facility was a turret punch called the Amada 358 Vipros King ("the King").[2] When the power returned, Midstate punch operator Chris Powell discovered that "the King went down." Powell Dep. 14:21–25, Resp. Mot. Summ. J. Ex. I, ECF No. 23-9. David Hiller, Midstate's maintenance technician, "[u]sed the troubleshooting skills . . . that [he] ha[d] available to [him] . . . [to] determine[] that [the King] had what [Midstate] considered a major electronic problem, electrical problem within the control deck." Hiller Dep. 8:7–13, Resp. Mot. Summ. J. Ex. H, ECF No. 23-8. To make that determination, he used "testing equipment, [his] meters and such and so forth and machine diagnostics, something that the machine will tell you what [its] problem is if [it] do[es]n't start up right." *Id.* at 8:14–21.[3]

On May 16, 2018, Amada service technician David Conley arrived at Midstate to examine the King and another Amada punch that would no longer operate. At Midstate, Conley was informed that both machines had stopped working after a power outage. Conley repaired the other punch by replacing the batteries and reprogramming it, but when he tried the same with the King, he found that the control board was faulty and needed to be replaced. He thinks the damage he saw and examined on both punches is consistent with the type of damage they could experience from a power outage or power surge event.

---

[2] The parties dispute whether Midstate purchased the King in 2010, *see* Resp. Mot. Summ. J. 14, or in 1990, *see* Reply 2. The parties also dispute whether Midstate used the King "regularly . . . if not daily," *see* Resp. Mot. Summ. J. 14, or only intermittently, *see* Reply 2.

[3] Whether Midstate discovered the King had become inoperative on the day of the outage caused by Progress Rail's crane is disputed: Progress Rail notes that Cincinnati's expert's report indicates that the damage was discovered on May 16, 2018. Reply 2 (citing Peterson Report 2, Resp. Mot. Summ. J. Ex. A, ECF No. 23-1).

Cincinnati insures Midstate's equipment.  On July 18, 2018, Cincinnati's counsel sent a letter to Progress Rail's corporate parent, Caterpillar, Inc., stating that his firm "ha[d] been retained by Cincinnati Insurance to represent its subrogation interests in a matter related to . . . damage to [its] insured's equipment that was discovered on May 16, 2018."  July 18, 2018 Letter, Mot. Summ. J. Ex. A, ECF No. 19-1.  The letter went on to indicate that if an investigation revealed that Progress Rail caused or contributed to the cause of the damage, Cincinnati "w[ould] pursue Progress Rail . . . to recover monies paid to its insured as a result of the damage."  *Id.*  The letter ended by requesting that Progress Rail contact Cincinnati's counsel to "attempt to resolve th[e] matter without costly litigation."  *Id.*  Progress Rail denies receiving the letter.  Mot. Summ. J. 3–4.

On June 29, 2018, Cincinnati's retained expert witness, Jon Peterson, visited Midstate to investigate the damage to the King.  According to the report he prepared for Cincinnati, both Hiller and Shawn Pitman, Midstate's manufacturing plant manager, "were present to point out areas of concern" and provide information.  Peterson Report 1, Resp. Mot. Summ. J. Ex. A, ECF No. 23-1.  As part of Peterson's investigation, he "walked around [the King], examined the exterior, . . . photographed the nameplate and other information, and then opened up the various compartments to examine and photograph the various circuit boards and other electronics inside."  Peterson Dep. 15:15–22, Mot. Summ. J. Ex. C, ECF No. 19-3.  Although he had electrical testing equipment with him, he did not use it in his investigation because his visual examination of the machine was consistent with Midstate's explanation of the damage.  *Id.* at 17:13–18:20.  Peterson's conclusion was that the damage to the King was consistent with a power disruption.

On July 13, 2018, Cincinnati's retained damages expert, Eugene Keith, visited Midstate for an initial site visit and inspection. Keith was given pictures of the King to look at because the King had been moved off-site. Keith recalls that Pitman said the King "had been moved to a warehouse. They were moving it so they could facilitate moving things in for rearranging their production." Keith Dep. 23:1–6, Mot. Summ. J. Ex. H, ECF No. 19-8.

Midstate decided not to replace the King. Instead, in November 2018, "finding space within its facility at a premium," Midstate sent the King to a scrap yard. Resp. Mot. Summ. J. 19. When the King was scrapped, Midstate also disposed of the associated computer equipment, *see* Pitman Dep. 41:22–25, Resp. Mot. Summ. J. Ex. G, ECF No. 23-7, and all the operations, maintenance, and inspection documents associated with the King, *see id.* 46:16–47:4.

On September 4, 2019, Cincinnati filed this action against Progress Rail in Illinois state court. Progress Rail removed the case to this Court pursuant to the Court's diversity jurisdiction. Not. Removal ¶ 1, ECF No. 1. Plaintiff asserts one claim of negligence against Defendant. Compl. ¶¶ 16–21, Not. Removal Ex. A, ECF No. 1-1. Specifically, Plaintiff alleges that "Progress Rail owed a duty to exercise reasonable care in its operation of a crane around overhead power lines," *id.* ¶ 17, and that Progress Rail, through its employee, breached its duty by failing to keep a proper lookout, failing to safely and prudently operate the crane, and striking the overhead power line with its crane, *id.* ¶ 18. Plaintiff alleges that "as a direct and proximate result of the aforementioned negligent acts and omissions . . . [the King] was damaged by the power interruption." *Id.* ¶ 19. Defendant moved to dismiss the complaint, *see* Mot. Dismiss, ECF No. 7, which the Court denied, *see Cincinnati Ins. Co. v. Progress Rail Servs. Corp.*, Case No. 4:19-cv-04200-SLD-JEH, 2020 WL 1970709, at *6 (C.D. Ill. Apr. 23, 2020).

The parties adopted a discovery plan on May 20, 2020.  *See* May 20, 2020 Text Order.
On December 14, 2020, the parties moved to extend the time for discovery and new deadlines
were set. *See* Mot. Ext'n Time Com. Disc., ECF No. 15; Dec. 15, 2020 Text Order.  Discovery
concluded June 29, 2021.  *See* Dec. 15, 2020 Text Order.

During discovery, Progress Rail retained its own expert, Steven Claxton, who produced
his own report.  Because the King had been scrapped, Claxton completed his analysis by
reviewing documents, photographs, and depositions.  Claxton Report 1–2, Mot. Summ. J. Ex. D,
ECF No. 19-4.  Without a physical examination and additional tests, Claxton believes he does
not have enough information to determine the cause of damage to the King.

Progress Rail now moves for summary judgment; to strike and exclude Cincinnati's
damages expert's testimony; and to strike the affidavit from Conley because Cincinnati did not
identify him as a potential witness pursuant to Federal Rule of Civil Procedure Rule 26(a).
Progress Rail also moves to file additional pages in its summary judgment reply, which the Court
GRANTS, and for leave to file a reply in support of its motion to strike the affidavit.

## DISCUSSION

Included in Progress Rail's motion for summary judgment is a request for sanctions:
Progress Rail requests that the Court dismiss this suit as a sanction for destruction of the King.
*See* Mot. Summ. J. 14–20.  The Court construes this argument as a motion for sanctions and
analyzes it as such.  Progress Rail also makes two more traditional summary judgment
arguments—that Cincinnati lacks evidence of causation, *id.* at 20–25, and that Cincinnati lacks
evidence of the proper measure of damages*, id.* at 26–29—but the Court finds it unnecessary to
address them because it agrees that dismissal is an appropriate sanction for the King's
destruction.

## I.   Legal Standard

Illinois law recognizes that a "potential litigant owes a duty to take reasonable measures to preserve the integrity of relevant and material evidence." *Shimanovsky v. Gen. Motors Corp.*, 692 N.E.2d 286, 290 (Ill. 1998). "This duty is based on . . . concern that, were [the court] unable to sanction a party for the presuit destruction of evidence, a potential litigant could circumvent discovery rules or escape liability simply by destroying the proof prior to the filing of a complaint." *Id.*; *see also Graves v. Daley*, 526 N.E.2d 679, 681 (Ill. App. Ct. 1988) ("[P]laintiffs are not free to destroy crucial evidence simply because a court order was not issued to preserve the evidence.").

"The issue of [a plaintiff's] pre-suit duty to preserve material evidence is substantive and, as such, Illinois law governs." *State Farm Fire & Cas. Co. v. Frigidaire, a Div. of Gen. Motors Corp.*, 146 F.R.D. 160, 162 (N.D. Ill. 1992); *see also Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804, 806 (7th Cir. 1995) (applying Illinois law in affirming the district court's sanction of dismissal for presuit destruction of material evidence); *Lekkas v. Mitsubishi Motors Corp.*, No. 97 C 6070, 2002 WL 31163722, at *2 (N.D. Ill. Sept. 26, 2002) ("In diversity cases, Illinois law governs a party's duty to preserve evidence."); *Thomas v. Bombardier-Rotax Motorenfabrik, GmbH*, 869 F. Supp. 551, 554–55 (N.D. Ill. 1994) (finding the same and applying Illinois law). Illinois law does not recognize a tort of intentional spoliation of evidence. *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 273 (1995). Rather, when a party destroys evidence before a suit commences, the adverse party may respond by bringing an action for negligent spoliation or invoking Illinois Supreme Court Rule 219(c). [4]   *See Adams v. Bath & Body Works, Inc.*, 830

---

[4] The Court notes that a fellow court in the district, considering the applicability of Rule 219(e), has cited Seventh Circuit dicta suggesting Rule 219(c) is procedural and does not apply in federal court. *See Tipsord v. Smith & Nephew, Inc.*, Case No. 16-1339, 2017 WL 2273137, at *2 (C.D. Ill. May 24, 2017) (citing *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 755 n.5. (7th Cir. 1994) ("Brandt also moved for sanctions under Illinois Supreme Court Rule

N.E.2d 645, 652 (Ill. App. Ct. 2005) (describing these two options as "two roads diverged in a wood").  Rule 219(c) authorizes trial courts to impose "sanction[s], including dismissal of the cause of action, upon any party who unreasonably refuses to comply with any provisions of th[e] court's discovery rules or any order entered pursuant to these rules."  *Shimanovsky*, 692 N.E.2d at 289 (Ill. 1998).  Because Illinois law recognizes that even potential litigants owe a duty to preserve material evidence, *id.* at 290, Illinois courts have imposed sanctions for a party's destruction of evidence even when the destruction occurred prior to the onset of litigation, *see id.* 289–91; *see also Graves*, 526 N.E.2d at 681.

"A defendant seeking sanctions is not required under Illinois law to prove that the plaintiff deliberately or intentionally destroyed, discarded, or altered the [evidence]."  *Iowa Ham Canning, Inc. v. Handtmann, Inc.*, 870 F. Supp. 238, 242 (N.D. Ill. 1994).  The defendant must establish that at the time of the destruction, the plaintiff knew (or should have known) that the evidence would be material in a contemplated suit and that lack of the evidence prejudices the defendant.  *See id.*; *see also Argueta v. Baltimore & Ohio Chi. Terminal R.R. Co.*, 586 N.E.2d 386, 393 (Ill. App. Ct. 1991).  If the defendant shows knowledge and prejudice, the court then has the discretion to impose a range of sanctions.  *See Lekkas*, 2002 WL 31163722, at *2.

In *Shimanovsky*, the Illinois Supreme Court enumerated six factors to consider when determining what, if any, Rule 219(c) sanctions to impose on a party:

> (1) the surprise to the adverse party; (2) the prejudicial effect of the proffered testimony or evidence; (3) the nature of the testimony or evidence; (4) the diligence of the adverse party in seeking discovery; (5) the timeliness of the

219(c)(vi).  Not surprisingly, the District Court ruled that relief under that provision was unavailable in federal court.")).  However, after *Brandt*, the Seventh Circuit in *Allstate Ins. Co. v. Sunbeam Corp*., 53 F.3d 804 (7th Cir. 1995), applied Illinois law in analyzing and affirming the district court's sanction of dismissal for the insurance company plaintiff's presuit destruction of material evidence.  Here, both parties appear to agree that Illinois law applies, so the Court will analyze the issue under Illinois law.  *Cf. Hill v. Brass Eagle, Inc.*, No. 15 C 368, 2016 WL 4505170, at *4 (N.D. Ill. Aug. 29, 2016) (citing *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005) (applying Indiana spoliation law where the parties agreed state law applied in the context of a spoliation tort claim)).

adverse party's objection to the testimony or evidence; and (6) the good faith of
the party offering the testimony or evidence,

noting that "no single factor is determinative." *Id.* at 291. The imposition of a particular

sanction is at the trial court's discretion, although "[a]n order of dismissal with prejudice or a

sanction which results in a default judgment is a drastic sanction to be invoked only in those

cases where the party's actions show a deliberate, contumacious or unwarranted disregard of the

court's authority." *Id.*

## II.    Analysis

The Court begins by asking whether Progress Rail has established that Cincinnati either

knew or should have known the King would be material evidence in its contemplated suit and

that its absence is prejudicial to Progress Rail. Cincinnati sent a letter to Progress Rail's counsel

indicating that Cincinnati would pursue repayment from Progress Rail if its investigation

indicated Progress Rail's conduct had a part in the damage to the King. *See* July 18, 2018 Letter.

Moreover, Cincinnati retained an expert, Jon Peterson, to examine the King and create a report

detailing the cause of the damage. *See generally* Peterson Report. "[Cincinnati] should have

known that [Progress Rail] would want to examine the [King], as [its] expert had done." *See*

*Farley Metals, Inc. v. Barber Colman Co.*, 645 N.E.2d 964, 969 (Ill. App. Ct. 1994); *see also*

*State Farm*, 146 F.R.D. at 163 ("There is no question that State Farm knew the allegedly

defective dishwasher would be material in this case. Immediately following the fire, State Farm

hired an expert to inspect the Lutz home."). Further, it is an undisputed fact in this case that

Midstate sent the King for salvage "[w]ith the input and knowledge of Cincinnati." *See* Mot.

Summ. J. 4; Resp. Mot Summ. J. 4; *see also* Pitman Dep. 47:22–25 (stating, of scrapping the

King, that Midstate "did not do anything without having [Cincinnati's] okay").

Moreover, the absence of the King prejudices Progress Rail, whose expert cannot examine it to determine the cause of the damage.  Cincinnati argues that Progress Rail's expert neglected to pursue other avenues of investigation that might have allowed him to better determine the cause of the damage, but none of those "potentially useful options," Resp. Mot. Summ. J. 23, would have substituted for physical examination and testing of the King.  Of the eighteen photographs in Cincinnati's expert report, Peterson Report 5–13, some of the photographs contain glare, some contain unreadable text, and still others depict small components from a distance; the disadvantage of investigation by document review is obvious, particularly in this action, where the condition of small electrical and mechanical parts and the precise nature, location, color, and texture of the physical damage on the King matter a great deal.  *See Am. Fam. Ins. Co. v. Vill. Pontiac-GMC, Inc.*, 585 N.E.2d 1115, 1118 (Ill. App. Ct. 1992) ("Plaintiffs were the only individuals with first-hand knowledge of the physical evidence which is far more probative under these circumstances in determining whether the vehicle caused the fire than photographs and two wires taken from the trunk area.").

Furthermore, Progress Rail's expert stated that he believed Cincinnati's expert's photographs revealed areas that "would have to be looked at further."  Claxton Dep. 23:20–24:8, Mot. Summ. J. Ex. G, ECF No. 19-7.  He cited specific tests—"confirming supplied voltage measurements, confirming internal power transformer voltage measurements and verification of motherboard failure"—he would have performed to assess the cause of the damage that could have eliminated alternate explanations.  Claxton Report 12.  That an investigator seeking to determine the King's cause of damage would benefit from the ability to perform tests is further demonstrated in the record by the fact that when Midstate's maintenance technician first

9

examined the King, he used testing equipment, meters, and machine diagnostics to determine the cause of the problem was related to an electrical malfunction.  *See* Hiller Dep. 8:14–21.

Moreover, at least some of Progress Rail's affirmative defenses seek to establish Cincinnati and Midstate's "failure to properly install, maintain or inspect the [King]."  *See* Answer, ECF No. 10.  Because these arguments necessarily implicate the particulars of the machine owned by Midstate, Progress Rail cannot rely on "a new version of the [King]" to gather evidence and illustrate those arguments.  *See Hill v. Brass Eagle, Inc.*, No. 15 C 368, 2016 WL 4505170, at *5 (N.D. Ill. Aug. 29, 2016) (finding, in a defective design case, the nature of the destroyed evidence weighed against the imposition of sanctions because the defendants had access to all of the information regarding the product's design and could use a new version of the product to demonstrate its design and make arguments to the jury).

Thus, this is not a case where the "defendant[] ha[s] not demonstrated how examination of the [evidence] would aid [it] in determining whether any of the[] [potential] causes [of the damage] were to blame."  *See Thomas*, 869 F. Supp. at 556.  Even Cincinnati's expert indicated, depending on what other information was available, it would be "very difficult" to offer an opinion about a machine's cause of failure without being able to examine it.  Peterson Dep. 28:5–13.  Here, the photographs and documents that Progress Rail's expert did have available to him to were limited and largely filtered through the eyes of Cincinnati's expert.  *See Thomas v. Bombardier-Rotax Motorenfabrik, GmbH*, 909 F. Supp. 585, 588 (N.D. Ill. 1996) ("[T]hese are non-objective pieces of evidence, having been prepared by plaintiff."); *cf. State Farm*, 146 F.R.D. at 163 ("As a matter of sound public policy, an expert should not be permitted intentionally or negligently to destroy such evidence and then substitute his or her own description of it." (quotation marks omitted)).

Because Progress Rail has shown knowledge and prejudice, the Court moves to application of the *Shimanovsky* factors. Having already addressed "the nature of the . . . evidence" and its prejudicial effect above, *see Shimanovsky*, 692 N.E.2d at 291, the Court finds most of the remaining factors also weigh in Progress Rail's favor.

First, as to "the surprise to the adverse party," *id.*, the Court is not persuaded by Cincinnati's argument that Midstate's destruction of the machine should not have come as a surprise to Progress Rail because Cincinnati put Progress Rail on notice of pending litigation through the July 18, 2018 letter to its corporate parent, Caterpillar. Resp. Mot. Summ. J. 21–22. That letter contained no reference to the potential scrapping of the King. Rather, it stated that Cincinnati might file a claim against Progress Rail and urged Progress Rail to reach out to resolve the matter without litigation. *See* July 18, 2018 Letter. The Court cannot see how Cincinnati is surprised that Progress Rail did not "pick up the phone or send a letter to Plaintiff's counsel[] asking if it could examine the subject press[] or preserve any part of it," Resp. Mot. Summ. J. 22, when its letter was not an "invitation" to "inspect the machine," *id.* at 22–23, but an invitation to resolve the issue without litigation (where, evidently, Progress Rail preferred to litigate).

But even if the letter had more explicitly foretold the King's fate, notice would not have absolved Cincinnati of its duty to make greater efforts to preserve the evidence. In *Kambylis v. Ford Motor Co.*, 788 N.E.2d 1 (Ill. App. Ct. 2003), the plaintiff's counsel sent the defendant at least one letter indicating the defendant "need[ed] to act quickly to preserve the vehicle" at issue in a products liability action, which had been impounded. *Id.* at 3 (quotation marks omitted). The car was destroyed and the trial court imposed sanctions. *Id.* at 2–3. The plaintiff conceded he had a duty to notify the defendant of the car's destruction but argued "he should not have been

sanctioned for failure to preserve the [car] because he notified [the] defendant of the [car's] impending destruction and [the] defendant failed to take action to inspect or preserve the vehicle." *Id.* at 7.  The appellate court rejected that argument, agreeing that the plaintiff had a duty to notify but finding his notice was insufficient because it was unclear whether the defendant ever received the letter and certain facts in the letter were incorrect.  *Id.* at 8–9.

Next, addressing the "the diligence of the adverse party in seeking discovery," *Shimanovsky*, 692 N.E.2d at 291, Cincinnati complains that Progress Rail was not diligent in seeking discovery because it failed to respond to its letter within four months.  Resp. Mot. Summ. J. 22–23.  Again, the Court does not agree that blame for the destruction of evidence can be placed on Progress Rail for failing to respond to a single letter.  In a similar vein, the Court cannot agree that Progress Rail's failure to retain an expert until August 2020 is shocking or demonstrates that Progress Rail has been dilatory.  *See id.* at 23.  The complaint in this case was filed in September 2019; discovery began in May 2020.  *See* May 20, 2020 Text Order.  Once the King was scrapped, it became irrelevant when Progress Rail retained its expert because the machine could never be examined again.  *See Milby v. Motorcycle Tour Conversions, Inc.*, No. 3–14–0824, 2016 WL 4494769, at *4 (Ill. App. Ct. Aug. 25, 2016) ("The evidence had been disposed of long before suit was filed and, by the time that defendant learned of the destruction, any chance of saving or finding the evidence had long since passed.").[5]

---

[5] The Court recognizes that unpublished Illinois appellate decisions are not precedential except in limited circumstances not applicable to this case.  *See* Ill. Sup. Ct. R. 23(e).  Where the Court cites to these cases, it does so only for their persuasive value.  *See, e.g.*, *Skiba v. Illinois Cent. R.R. Co.*, No. 18 C 3381, 2021 WL 492900, at *4 n.3 (N.D. Ill. Feb. 10, 2021) (citing an unpublished Illinois appellate order "as persuasive authority, not binding precedent"); *United States v. Hillcrest Resort, Inc.*, Case No. 4:15-cv-04194-SLD-JEH, 2019 WL 6112840, at *2 (C.D. Ill. Nov. 18, 2019) (finding that although Illinois Supreme Court Rule 23 is not binding on federal courts, the Court could not give unpublished cases precedential effect and thus citing to those cases for their persuasive value only).

Then there is the question of good faith.  Cincinnati describes the King's destruction as an "innocent act," Resp. Mot. Summ. J. 3: "Midstate had a business to run, and a very large piece of machinery that no longer worked, sitting in the middle of its factory floor.  Four months of waiting for Defendant to get in touch . . . to arrange an inspection was more than a reasonable period of time to wait."  *Id.* at 22.  While the Court does not doubt that having a large and nonfunctional machine in its facility was an inconvenience to Midstate, there were other options besides scrapping the King, such as putting it in a warehouse (as Plaintiff's damages expert, Keith, suggested it might already have been, *see* Keith Dep. 23:1–6); pushing it outside, *see* Pitman Dep. 48:9–14; or saving the circuit boards whose physical damage is at issue in this case, which Peterson indicated were only "a foot or more square."  Peterson Dep. 39:1–25.  And while storing the King may have been a hardship, the same cannot be said for its operations, maintenance, and inspection documents, all of which Cincinnati allowed to be tossed with it.  *See* Pitman Dep. 46:16–47:4.

Cincinnati is not an unsophisticated actor.  *Cf. Schuring v. Cottrell, Inc.*, No. 13 C 7142, 2015 WL 8970631, at *2 (N.D. Ill. Dec. 16, 2015) (finding it was not reasonable to expect the plaintiff, a layperson, to know not to wear the shoes he wore on the day of the fall at issue in the case, particularly because the shoes were related to the defendant's theory of the case and not his own).  Here, while there is no indication in the record that Cincinnati acted maliciously in allowing the King to be scrapped, Cincinnati has not attempted to refute that it "deliberately" and "intentionally" sanctioned the King's destruction.  *See Milby*, 2016 WL 4494769, at *4.  Thus, "while there may not be evidence of [Cincinnati's] bad faith, there is certainly a lack of evidence of its good faith."  *See Amcor Flexibles, Inc. v. Ill. Com. Comm'n*, No. 1–15–2985, 2016 WL 3961307, at *17 (Ill. App. Ct. July 21, 2016).

The Court does agree with Cincinnati that it would have been better if Progress Rail raised its concerns earlier in the litigation. *See* Resp. Mot. Summ. J. 22. But this is just one factor in Cincinnati's favor.

The Court recognizes that dismissal—or barring evidence or expert testimony such that dismissal necessarily follows—is a drastic sanction. *Shimanovsky*, 692 N.E.2d at 291. But the Court finds that if a more tailored sanction were to be imposed, a fundamental unfairness would remain. *See id.* By allowing the King and all of the associated documentation about its history, use, and maintenance to be destroyed just four months after a single letter, Cincinnati foreclosed Progress Rail's ability to pursue its affirmative defenses that the damage to the King was caused by Cincinnati and Midstate's own negligence in its use, maintenance, and repair. *See Allstate Ins. Co.*, 53 F.3d at 807 ("[F]ailure to preserve this evidence prejudiced Sunbeam's efforts to present a defense that the fire was caused by some source other than its grill."); *Shelbyville Mut. Ins. Co. v. Sunbeam Leisure Prods. Co.*, 634 N.E.2d 1319, 1324 (Ill. App. Ct. 1994) ("By the inadvertent destruction of a portion of the grill, the insurance company effectively foreclosed a possible affirmative defense of what may have been the actual cause of the fire. Sunbeam thus lost any opportunity to present affirmative defenses of alternative causes . . . and was limited . . . to merely rebutting [the insurance company's expert's] opinion."). This would be true—perhaps especially true—even if the Court excluded all evidence related to the King's condition and Cincinnati based its case solely on its theory that the Progress Rail-caused power outage and damage to the King "temporally coincide[d] to such a remarkable extent that the possibility they are unrelated seems virtually nonexistent." *See* Resp. Mot. Summ. J. 26. Cincinnati maintains its case can be presented through these commonsense inferences, yet sanctioned the destruction of the machine and the documents—such as maintenance records that would show whether the

14

machine was unreliable or had a record of problems—that would allow Progress Rail to attack those assumptions.

Here, the Court is "persuaded . . . that [Cincinnati's] intentional destruction of the evidence was not reasonable in the circumstances and deprived [Progress Rail] of the ability to establish its case." *Thomas*, 909 F. Supp. at 589 (quotation marks omitted).  By allowing the King to be destroyed such that Progress Rail was forced to rely on Cincinnati's documents and photographs and none of Midstate's original records or the machine itself, Cincinnati precluded Progress Rail's ability to mount its affirmative defenses—or indeed, to mount any defense that was not dictated on Cincinnati's own terms.  On these facts, where the evidence is crucial to the case, no physical evidence whatsoever was preserved, the evidence was destroyed intentionally with no notice to the defendant, and the inability to examine the evidence has deprived the ability of the defendant to put on its affirmative defenses, the Court finds that no sanction less than dismissal can cure the prejudice.  *See Milby*, 2016 WL 449476, at \*5 (affirming dismissal was appropriate where "[t]here was no other sanction that the trial court could have imposed in this case to advance the litigation in a manner that was fair to defendant").  Accordingly, the Court grants Progress Rail's request for sanctions and agrees that the appropriate sanction is dismissal of this action.

## CONCLUSION

Accordingly, the Court GRANTS Defendant Progress Rail Services Corporation's Motion for Summary Judgment, ECF No. 19, to the extent that it requests dismissal of the suit as a sanction for the destruction of evidence, and GRANTS its motion to file additional pages in its summary judgment reply, ECF No. 25.  The case is DISMISSED with prejudice.  The remaining

motions, ECF Nos. 20, 24, 28, are MOOT.  The Clerk is directed to enter judgment and close the case.

Entered this 26th day of October, 2021.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE